1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LAN T. LIU,

          Plaintiff,

   v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security
Administration,

        Defendant.

Case No.: 11-cv-6120 JSC

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT (Dkt. No. 35)**

     Plaintiff Lan Liu alleges that Defendant Carolyn W. Colvin[1], the Acting Commissioner
of the Social Security Administration ("SSA"), terminated her employment based on her
national origin.  Now pending before the Court is Defendant's Motion for Summary
Judgment.  (Dkt. No. 35.)  After carefully considering the pleadings and evidence submitted

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d) the Court automatically substitutes
Carolyn Colvin as the successor officer in this proceeding.

by the parties, and having had the benefit of oral argument on April 8, 2013, the Court

GRANTS Defendant's motion for summary judgment.[2]

### SUMMARY JUDGMENT EVIDENCE

Plaintiff Liu moved to the United States with her family when she was 16 years-old.
She is multi-lingual and speaks English, Vietnamese, and Cantonese, and can provide basic
translation of Mandarin.  On March 31, 2008, Defendant hired Plaintiff as a Bilingual Service
Representative Trainee under the Federal Career Internship Program ("FCIP").   According to
the regulations:

> Appointments under the Federal Career Intern Program (FCIP) may not exceed
> 2 years, except as described in paragraph (o)(2) of this section.  Initial
> appointments are made to a position at the grade GS–5, 7, or 9 (and equivalent)
> or other trainee levels appropriate for the Program, unless otherwise approved
> by OPM…
> …
> (2) Extensions. (i) Agencies must request, in writing, OPM approval to establish
> or extend internships for up to 1 additional year beyond the authorized
> 2 years for additional training and/or developmental activities.
> …
> (5) Promotions. During the internship period, career interns may receive
> promotions as determined by an agency's plan. This provision does not confer
> entitlement to promotion.
> (6) Conversion to competitive service. Except as provided in paragraph
> (o)(6)(ii) of this section, service as a career intern confers no rights to further
> Federal employment in either the competitive or excepted service upon the
> expiration of the internship period. (i) Competitive civil service status may be
> granted to career interns who successfully complete their internships and meet
> all qualification, suitability, and performance requirements. These
> noncompetitive conversions will be effective on the date the 2-year service
> requirement is met, or at the end of an agency or OPM-approved extension.
> …
> (7) Terminations. As a condition of employment, the appointment of a career
> intern expires at the end of the 2-year internship period, plus any extension…

5 C.F.R. § 213.3202(o) (2010).  The Notification of Personnel Action confirming Plaintiff's

hiring includes the following language: "[t]his appointment is intended to continue for 2

---

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant
to 28 U.S.C. § 636(c).

years, unless extended up to 1 additional year.  Upon satisfactory completion of the internship, you may be noncompetitively converted to a career or career-conditional appointment.  If you fail to satisfactorily complete the internship, your…[the text continues on the second page which is not in the record]" (Dkt. No. 44-1, Ex. G, p. 81.[3])

Plaintiff worked at the SSA Downtown Oakland District Office (the "Oakland Office").  In August 2008, Plaintiff began the formal training for the Service Representative position.  Two other individuals were hired as Bilingual Service Representatives under the FCIP program and participated in the training with Plaintiff: Salvador Gavino and Lien Lu.  Mr. Gavino is Latino and speaks Spanish and Ms. Lu is Chinese-American and speaks Chinese.[4]  During the time she was employed by the SSA, Plaintiff was the only Vietnamese-speaking Service Representative in the Oakland Office.  The population served by the Oakland Office was approximately 50 percent Chinese and 10 to 15 percent Vietnamese.  For individuals requiring translation services, staff could either use a telephone translation service or ask another employee to translate.

During Plaintiff's employment with the SSA, a Service Representative's work was tracked by work units.[5]  Work units were based on the number and type of changes made to a claimant's social security record.  (Dkt. No. 51, Ex. FF, ¶ 5.)  Some of a Service Representative's caseload generated more work units than others, and some of the workload generated no work units.  (*Id.*)  For example, translation services did not earn any work units.  In an average month, Service Representatives spent two to three days responding to telephone inquiries from the public, one or two "adjudication days" at their desk resolving assigned matters, usually based on an assigned range of the alphabet based on client last names, and the remainder of the month working on special or administrative tasks, and assisting with walk-in traffic on the interview floor.  (*Id.*)  If a Service Representative or Claims Representative required translation services to assist a client, the representative conducting

---

[3] The page number citations (p. or pp.) herein refers to the ECF page number.
[4] Neither party specifies what dialect of Chinese Ms. Lu speaks.
[5] SSA has since discontinued use of work units to measure productivity.

United States District Court
Northern District of California

the interview would receive work units, while the individual providing translation services would not.  (Dkt. No. 43 ¶ 7.)

During her employment as a FCIP intern, Plaintiff received regular pay and grade increases consistent with her "performing at an acceptable level of competence." (Dkt. No. 45, Ex. V, p. 37.)  Plaintiff received successful ratings on her 2008 and 2009 Annual Performance Evaluations from her direct supervisor Christina Jones.  Jones also testified that Plaintiff "successfully performed her position."  However, Plaintiff's 2009 performance appraisal indicates that she did not meet the work unit goal for any of the months in the rating period.  (Dkt No. 51, Ex. EE pp. 2-4; Ex. FF ¶¶ 3-6.)  Plaintiff asked Jones for more work and they discussed ways for Plaintiff to improve her numbers including taking more interviews from the daily walk-in traffic; however, Jones indicated that several other employees had also asked for additional work and she had difficulty finding any.  (*Id.* at Ex. FF, ¶ 4.)

In February 2010, Plaintiff vacationed to Vietnam.  When she returned to work, Plaintiff, as in all previous months, was given a copy of the prior month's work unit production report to sign.  Jones had written a note on the February 2010 report stating "Lan, you're on the bottom.  See what Vietnam did to you." (Dkt. No. 45, Ex. N, p. 2.)

Near this same time, Jones conducted a performance review as Plaintiff's FCIP internship appointment was expiring.  Jones found that Plaintiff had satisfactorily performed her work, the work was accurate, timely processed, not overdue or unduly late, and that Plaintiff was progressing towards a GS-8 Service Representative position such that she should be retained following the completion of her internship.

On March 19, 2010, Gregory Ricks, the newly-installed District Manager, contacted Adria Leslie, a SSA Labor and Employee Relations Specialist, to discuss Plaintiff's performance.  Ricks told Leslie that he did not want to convert Plaintiff to a permanent employee at the end of her FCIP internship based on poor performance—he indicated that Plaintiff's work units had averaged 50 per month since January 2009 whereas her trainee peers were averaging 118 work units per month.  On March 26, 2010, Leslie wrote Ricks:

> We do not recommend doing a final PACS appraisal in this case, because a final appraisal requires giving a rating.[6]  It would be inconsistent to rate an employee as Successful and then not retain them.
>
> When giving notice of FCIP expiration, the best policy is not to discuss the reasons with the employee.  The employee should be given the letter with a minimum of discussion.  For this reason, we do not recommend adding anything to the 7B at this point, because the employee would need to sign/initial it, and that would invite discussion.  For this same reason, we do not recommend documenting PACS in the Midterm or Informational Appraisal sections.
>
> The productivity data should be kept in a separate office MI folder.  The folder should contain the MI documentation that you have compiled on all three GS6 trainees.  it could also contain other MI data as well.  Just like memory joggers, the file should not be labeled with the name of any specific employee.

(Dkt. No. 44-1, Ex. G, p. 79.)

Three days before the expiration of Plaintiff's appointment under the FCIP program, Ricks informed Plaintiff that she would not be converted to a permanent employee.  (Dkt. No. 51, Ex. GG, p. 20 ¶ 3.)  She was immediately placed on administrative leave.  Ricks attests that the reason he did not convert Plaintiff to permanent employment was because she was not performing at an adequate level as measured by work units. (*Id*. at ¶ 5.)  The Notification of Personnel Action (SF50) issued upon her termination states "[s]ince the reason for separation is generally disqualifying, this department will appeal any award of unemployment compensation benefits."  (Dkt. No. 44-1, Ex I, p. 87.)

---

[6] According to Leslie, SSA employees are evaluated on four elements: interpersonal skills, participation, achieves business results, and quality. The evaluations, also referred to as appraisals, are generally recorded in a computer system called PACS. For employees to be deemed successful pursuant to this evaluation, they must be rated as successful in all four areas. Under the collective bargaining agreement, employees cannot be rated as unsuccessful unless they are under a formal performance improvement plan ("PIP").  While employees under the FCIP program are treated as if they were governed by the union contract (although technically they are not), the Agency practice is not to place them on PIPs because they are not permanent employees. Leslie advised Ricks not to give Plaintiff a final appraisal because he had deemed Plaintiff's performance to be unsuccessful, but they could not rate her as unsuccessful because she was not on a PIP and they did not put FCIP employees on PIPs. (Dkt. No. 48, Ex. AA, 166:12-18 & p. 38.)

5

A couple of weeks later, Leslie emailed her supervisor Chris Gandara regarding Plaintiff's termination.  (Dkt. No. 48, Ex. AA,  p. 41.) Leslie's email advises Gandara of Plaintiff's termination as a FCIP non-conversion.  She discusses further:

> I spoke to management several times during the week prior to counsel them about proper documentation.  However, they never submitted any documentation to LERT, and there is no folder, except Roland presumably has a copy of the notice.  Based on their description of the evidence, LERT's advice was that the evidence was not strong.  Although the employee had documented low productivity, she was not on notice that a failure to improve her productivity could result in the loss of her job.
>
> The employee has indicated that she plans to file an EEO complaint.
>
> I am concerned that LERT had never viewed the file.  Should I ask them again for a copy of the file?  I know that often documentation is stronger if dated and signed, etc., and it may be prudent if we review the file to make sure that the evidence is in the best possible format.  Or is it too late for them to do "declaration of supervisor" forms after the effective date?

(*Id.*)  Gandara responded: "Yes, we should review the file and whatever documentation they have on the Employee.  It is not too late to get declarations from the supervisor.  They will be needed if she files EEO."  (*Id.*)

Plaintiff timely sought EEO counseling through SSA and filed a formal complaint with the Equal Employment Opportunity Commission on April 29, 2010.  After 180 days passed, Plaintiff requested a right to sue and filed the underlying lawsuit alleging a single claim of discrimination based on national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, et seq.  Defendant now moves for summary judgment on the ground that no reasonable trier of fact could find that Plaintiff was terminated on account of her national origin.

### LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  The Court must draw "all reasonable inferences [and] resolve all factual conflicts in favor of the non-moving party."  *Murphy v. Schneider Nat'l, Inc.*, 362

F.3d 1133, 1138 (9th Cir. 2004). A fact is material if it "might affect the outcome of the suit under the governing law," and an issue is genuine if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There can be "no genuine issue as to any material fact" when the moving party shows "a complete failure of proof concerning an essential element of the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Defendant, as the moving party, has the burden of producing evidence negating an essential element of each claim on which it seeks judgment or showing that Plaintiff cannot produce evidence sufficient to satisfy her burden of proof at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once Defendant meets that burden, Plaintiff, as the non-moving party, must show that a material factual dispute exists. *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Allegations alone are not sufficient to meet Plaintiff's burden; instead, Plaintiff must submit admissible evidence. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). Plaintiff's evidence must be such that a reasonable trier of fact could return a verdict in Plaintiff's favor, *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995), and the Court "is not required to comb the record to find some reason to deny a motion for summary judgment," *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988).

## DISCUSSION

In an employment discrimination action the Court applies the three-step analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff must make a prima facie showing of discrimination. *Id*. at 802. Next, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Id* . Lastly, the burden shifts back to the plaintiff to show that the employer's proffered explanation is merely a pretext for a discriminatory motive. *Id*. at 804.

### A.   Prima Facie Case

A plaintiff makes out a prima facie showing of employment discrimination by establishing that: (1) she is a member of a protected class; (2) she was qualified for her

United States District Court
Northern District of California

1  position and was performing her job satisfactorily; (3) she suffered an adverse employment

2  action; and (4) similarly situated individuals outside of her protected class were treated more

3  favorably, or some other circumstance surrounding the adverse employment action gives rise

4  to an inference of discrimination.  *Hawn v. Executive Jet Mgmt., Inc*., 615 F.3d 1151, 1156

5  (9th Cir. 2010).

6        The parties agree that Plaintiff is a member of a protected class based on her

7  Vietnamese nationality.  And there is no credible dispute regarding the third factor:

8  Defendant's decision not to allow Plaintiff to become a permanent employee at the end of her

9  probationary period—whether characterized as a termination or not—is an adverse

10  employment action.  *See, e.g*., *Gregory v. City & County of San Francisco*, No. 09-1800,

11  2010 WL 5300887, at *5 (N.D. Cal. Dec. 20, 2010) (finding an adverse action where plaintiff

12  was released from his probationary position as a food service worker); *Woodson v. Int'l*

13  *Business Machines*, No. 05-3387, 2006 WL 1195453, at*4–5 (N.D. Cal. 2006) (stating that an

14  employment action is actionable only if it results in "a substantial adverse change in the terms

15  and conditions" such as "reduction in an employee's potential for career advancement").

16  Thus, Plaintiff's prima facie case of discrimination hinges on her ability to establish the third

17  element, that she was performing according to her employer's legitimate expectations, and the

18  fourth element, that other similarly situated employees were treated more favorably or that

19  other circumstances support an inference of national origin discrimination.

20        Although Defendant argues that Plaintiff was not qualified because she did not

21  perform according to SSA's legitimate expectations regarding productivity of work units,

22  Defendant concedes that the critical issue on summary judgment is the fourth element.  This

23  concession is unsurprising: Plaintiff's "successful" employment evaluations create at least a

24  dispute as to whether she was performing her job satisfactorily.  Accordingly, the Court's

25  analysis will focus on whether Plaintiff has identified evidence sufficient to support a finding

26  of the fourth element of her prima facie showing.

27

28

**1.      Plaintiff's Treatment vis a vis Similarly Situated Employees**

Plaintiff first argues that with respect to her work unit productivity, Defendant treated her different from similarly situated employees, thus giving rise to an inference of discrimination.  The resolution of this issue turns on which employees are properly considered similarly situated to Plaintiff.

Although Plaintiff disputes the process by which work units were calculated, she does not dispute that she performed far fewer work units than the other two FCIP interns.  Plaintiff argues instead that throughout her employment at the Oakland Office, out of the approximately 30 Service/Claims Representatives—career and FCIP interns alike—her work unit level was as good or better than at least five other Service/Claims Representatives and Defendant did not discipline or terminate these lower performing representatives. [7]  Thus, Plaintiff argues that she has submitted evidence sufficient to support a finding that she was treated different from similarly situated employees.  Defendant contends that the permanent employees are not relevant comparators because Plaintiff was only evaluated against the two other FCIP interns as these were the only individuals about whom Ricks had to decide whether to convert to permanent employment.  (Dkt. No. 51, Ex. GG, ¶¶ 5-7); *see also* 5 C.F.R. § 213.3202(o) (2010).

District courts "generally analyze an employer's reasons for why employees are not similarly situated at the pretext stage of *McDonnell Douglas*, not the prima facie stage." *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1159 (9th Cir. 2010) (internal citations omitted).  At the prima facie stage, plaintiff's burden is "much less." *Id*.  Further, "the determination whether a plaintiff and a coworker are similarly situated will generally be a question of fact." *Id*.  However, "[t]he *prima facie* case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a

_____

[7] Plaintiff has moved to strike Defendant's submission of the monthly work unit production reports submitted as an exhibit to the Declaration of Abraham Simmons in support of Defendant's Motion for Summary Judgment.  However, Plaintiff has submitted these same work unit production reports.  (*Compare* Dkt. No. 38-3 *with* Dkt. No. 45, Ex. O.) The Court thus denies Plaintiff's request to strike as moot.

sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).  In *Hawn*, for example, the district court considered the issue of the proper comparators at the prima facie case stage and at the pretext stage and granted defendant summary judgment.  615 F.3d at 1158.  The Ninth Circuit affirmed holding that co-workers who engaged in similar conduct as the plaintiff but were not disciplined were not similarly situated because no complaints had been made about the co-workers' conduct.  615 F.3d at 1159-61; *see also Moran v. Selig*, 447 F.3d 748, 755-57 (9th Cir. 2006) (affirming summary judgment on ground that the plaintiff had not satisfied the fourth step of the primie facie case because alleged comparators were not similarly situated in all respects).

    "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).  The plaintiff must show that she is "similarly situated to those employees in all material respects." *Moran,* 447 F.3d at 755.  Employees in supervisory roles are generally not similarly situated, *see Vasquez,* 349 F.3d at 641, nor are probationary and non-probationary employees, *Steik v. Garcia*, No. 02-5942, 2003 WL 22992223, at *8 (N.D. Cal. Dec. 9, 2003).

    Plaintiff was similarly situated to the other two FCIP interns, but a reasonable trier of fact could not find that she was similarly situated to permanent employees who could only be terminated if the agency followed the extensive procedural requirements set forth by statute. *See Lovshin v. Dept of Navy*, 767 F.2d 826, 834 (Fed. Cir. 1985) (describing the process for removal or demotion of an employee for performance-based reasons under the Civil Service Reform Act of 1978); *see also Steinhauer v. DeGolier*, 359 F.3d 481, 484 (7th Cir. 2004) (holding that co-workers were not similarly situated because plaintiff was still on probation while his co-worker was not); *Bogren v. Minnesota*, 236 F.3d 399, 405 (8th Cir. 2000) ("We agree with the premise underlying the district court's conclusion; troopers beyond the probationary period are not similarly situated to a probationary trooper).  It is one thing to prevent a low-productivity probationary employee from converting to permanent status (and thus becoming entitled to a myriad of procedural protections before any discipline may be

United States District Court
Northern District of California

imposed), and quite another to discipline or terminate a low-productivity permanent employee who is already entitled to a myriad of procedural protections.  Indeed, Ricks only compared Plaintiff to the other two FCIP interns and determined that her productivity, as reflected by work units, was at or below 50 percent of their work unit productivity.  (Dkt. No. 51, Ex. GG, ¶ 5.)  From January 2009 through January 2010 Plaintiff's average work productivity was 49.5 units per month and her trainee peers averaged 86.8 units per month.  (Dkt. No. 45, Ex. W, p. 40.)  This discrepancy is not disputed.

Plaintiff nonetheless contends that Ricks, in fact, compared Plaintiff's productivity to all Oakland Office Service/Claims Representatives, or that at least it is disputed whether he did.  At oral argument she referred repeatedly to a January 2010 email which allegedly shows that Ricks evaluated Plaintiff's productivity against all employees as opposed to just the other two FCIP interns; however, she could not identify where that email was in the record and the Court has not located any such email upon its own review of the voluminous record.  The record does include copies of multiple March of 2010 emails indicating that Ricks based his decision on Plaintiff's low work unit productivity compared to her trainee peers.  (*See, e.g.*, Dkt. No. 48, p. 34 (March 19, 2010 email from Adria Leslie to Chris Gandara "[h]er work units have averaged 50 per month since January 2009 (I believe that is when she got out of the class). Her trainee peers are averaging 118 work units per month.").)  Accordingly, Plaintiff has not satisfied her burden of producing evidence from which the Court could infer that Ricks compared her to all Service/Claims Representatives as opposed to just the FCIP interns.

Because the only employees similarly situated to Plaintiff are the other two FCIP interns, and because it is undisputed that Plaintiff's work unit productivity was 50% of that of her intern peers, Plaintiff has not satisfied her prima facie burden of demonstrating that she was treated less favorably than similarly situated employees.  The Court thus must determine whether Plaintiff has satisfied the fourth prong of her prima facie case through other evidence surrounding the adverse employment action which gives rise to an inference of discrimination.

### 2.    Direct Evidence of Discrimination

As direct evidence of discrimination, Plaintiff cites the statement of her supervisor Christina Jones on her February 2010 work unit production report: "Lan, you're on the bottom.  See what Vietnam did to you." (Dkt. No. 45, Ex. N, p. 2.)  Defendant responds that this statement referred to Plaintiff having vacationed in Vietnam toward the end of her probationary period which resulted in a significant drop in her work unit productivity. Defendant's explanation is plausible given that it is undisputed that Plaintiff took time off in February 2010 to visit Vietnam and her work units that month were only 9.6 whereas in the prior month her units were 65.3.  (*Compare* Dkt. No. 45, Ex. O p. 4 *with* p. 7).  Nonetheless, on summary judgment the Court must draw all reasonable inferences in Plaintiff's favor. Even if there was a discriminatory animus behind Jones' statement, however, it is undisputed that Jones did not make the decision to terminate Plaintiff; in fact, after Jones made the Vietnam comment she recommended that Plaintiff be converted to permanent employment at the conclusion of her FCIP internship  And there is no evidence that Ricks was even aware of Jones' statement, let alone that he made or adopted a similar statement as his own.  The allegedly discriminatory statement is therefore not linked to her termination.  *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 919 (9th Cir. 1996)  (holding that a comment that is not directly tied to an adverse action is not direct evidence of discrimination); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (holding that the comment "[w]e don't necessarily like grey hair" had been "uttered in an ambivalent manner and was not tied directly to [plaintiff's] termination"). As the Supreme Court noted in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989), "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision. The plaintiff must show that the employer actually relied on her gender in making its decision." At most, Jones' comment constitutes a "stray remark" which is insufficient to establish discrimination.  *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990).

3.      **Circumstantial Evidence of Discrimination**

Plaintiff highlights additional evidence, the totality of which she contends supports a connection between Plaintiff's national origin and her termination.  Plaintiff contends that (1) Defendant's allocation of work units had a disparate impact on Plaintiff; (2) Defendant's failure to follow its own policies evidences a discriminatory intent; (3) Defendant's changing reasons for termination further suggest a discriminatory motive; and (4) inconsistencies in statements before the EEO investigator suggest discrimination.

a)      **Allocation of Work Units**

Plaintiff contends that the allocation of work units was discriminatory in two ways. First, because of Plaintiff's multi-lingual skills, she was often called upon to translate for her colleagues, but was not credited with work units for the time spent performing translation-related activities.  Second, Plaintiff complains that she did not have enough work to produce more work units and that her requests for additional work were ignored whereas the other FCIP interns were provided additional work.

It is undisputed that Plaintiff speaks English, Vietnamese, and Cantonese, and can provide basic Mandarin translation.  Plaintiff's supervisor, Christina Jones, testified that up to 50 percent of the individuals served by the Oakland Office were Chinese and another 10-15 percent were Vietnamese. (Dkt. No. 46, Ex. Z, 34:5-35:7.)  During Plaintiff's employment she was the only Service Representative who provided translation services for Vietnamese individuals, although there is no evidence in the record as to how often she did so.  (*Id.* at 36:15-22.)  Plaintiff's written opposition nonetheless asserts that "she was much more in demand than the other translators in the office, including the two FCIP employees," Galvino who spoke English and Spanish, and Lu who spoke English and Chinese.  (Dkt. No. 42, 7:13-14.)  Plaintiff's evidentiary cites, however, do not bear this out: one refers to unsubmitted deposition pages and the other says nothing about the other two FCIP employees.  It is not the Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted).  Rather, a court is entitled to "rely on the nonmoving party to identify with reasonable particularity the evidence that

United States District Court
Northern District of California

1  precludes summary judgment."  *Id.*; *see also Carmen v. San Francisco Unified Sch. Dist.*, 237

2  F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for

3  evidence establishing a genuine issue of fact, where the evidence is not set forth in the

4  opposing papers with adequate references so that it could conveniently be found").  Plaintiff

5  has not submitted admissible evidence specifying what percentage of her time was spent

6  providing translation services, or quantifying the amount of translation services provided by

7  her comparators.

8       In any event, regardless of how much time Plaintiff spent translating, it is undisputed

9  that no employees received work units for translation services.  Plaintiff argues that this

10  facially neutral policy disparately impacted her because she translated more because of her

11  national origin.  This theory fails for several reasons.  First, as discussed above, Plaintiff has

12  failed to quantify how much time she spent translating; her own testimony suggests that

13  translating sometimes took "one second, two second, one minute" and "sometimes one hour."

14  (Dkt. No. 51, Ex. II, 35:22-36:9.)  Further, Plaintiff has also not quantified how much time

15  she spent providing Vietnamese as opposed to Cantonese or Mandarin-related translation

16  services.   Plaintiff's Vietnamese translation services may relate to her national origin, but

17  Plaintiff has not argued, let alone established, that her Cantonese or Mandarin language skills

18  are because of her national origin.  Over 50 percent of the Oakland Office clients were

19  Chinese, only 10-15 percent were Vietnamese.  And the other two FCIP interns were

20  similarly hired as Bilingual Service Representatives and provided at least some translation-

21  related services.  Thus, while the policy of failing to provide work units for translation-related

22  services may have been unfair, a reasonable trier of fact could not find that the policy had a

23  disparate impact on Plaintiff because of her national origin as opposed to her multi-lingual

24  skills.

25       Plaintiff also contends that her work units were disproportionately low because the

26  portion of the alphabet that she was allocated to serve—XYZ— necessarily has fewer names

27  associated with it.  In her written opposition Plaintiff insists that "Ms. Jones, acknowledged

28  that the area of the alphabet that Ms. Liu was assigned resulted in 'less incoming desk work;"

14

however, Plaintiff does not cite to any evidence in support of this proposition.  (Dkt. No. 42, 19:1-3.)  Moreover, Plaintiff has not provided any evidence regarding how the alphabet assignments were made or of the alpha assignments of the other two FCIP interns.  Indeed, the email Plaintiff submits in support of her contention regarding the disfavoredness of the XYZ assignment does not even list the other two FCIP interns.  (Dkt. No. 44-1, Ex. J.)  Plaintiff contends that management acknowledged that FCIP intern Galvino had "lower productivity goals than average, but management ensured that he had 'a larger alpha'" citing Exhibit KK.  (Dkt. No. 42, 19:9-11.)  Exhibit KK is a one page document entitled "SR Monthly Performance Measures" which appears to be for Sal Galvino and includes the following language in the management comments box: "Sal, what happened this month?  You were out only two vacation days.  I know you can do better, you have a bigger [sic] alpha now so there is no shortage of work.  You should make sure you are getting credit for all the work you do.  You are doing fine in meeting all the other workload goals and your quality is very good."  (Dkt. No. 54.)  The document, however, is entirely unauthenticated—it is not even referenced in the Declaration of Wendy Musell to which it is attached.  *See Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002) ("unauthenticated documents cannot be considered in a motion for summary judgment").[8]  Moreover, it is referring to Galvino's production in June 2010—two months after the termination of Plaintiff's employment.  Finally, it is unclear who wrote the comments or what the comments mean when they refer to "a bigger [sic] alpha"—bigger as compared to what?

In any event, while Plaintiff may have performed as many work units as she reasonably could based on her alphabet assignment, she has not proffered any evidence that remotely supports an inference that her alphabet assignment was based upon her national origin.  Similarly, while Plaintiff testified that the two other trainees received special projects and work assignments, Plaintiff has not submitted evidence establishing that they received

---

[8] Defendant asks the Court to strike all of the exhibits (except for the deposition excerpts) submitted with the Declaration of Wendy Mussel as unauthenticated.  Given that the Court is granting Defendant's Motion for Summary Judgment, it finds that it is unnecessary to reach Defendant's evidentiary objections except with respect to Exhibit KK.

United States District Court
Northern District of California

1  additional work units for these special projects.[9]  Further, although Plaintiff asked for more

2  work, other employees also sought additional work, but supervisor Jones "had trouble finding

3  additional work." (Dkt. No. 51, Ex. FF, ¶ 4.)  Again, the record is bereft of any evidence that

4  supports an inference that Defendant assigned or did not assign Plaintiff work based on her

5  national origin.  While the assignments may have been unfair, there is nothing that connects

6  that unfairness to her national origin.

7            **b)      Defendant's failure to follow procedures**

8            Plaintiff also contends that Defendant repeatedly failed to follow its own procedures

9  with respect to Plaintiff's termination and that these failures support an inference of

10  discriminatory intent.  She cites the testimony of the human resource employee, Leslie, to the

11  effect that Defendant's practice was and is to treat FCIP employees as if they are subject to

12  the collective bargaining agreement ("cba") applicable to permanent employees.  From this

13  testimony Plaintiff argues that because the cba would require a "Performance Improvement

14  Plan" ("PIP") for employees prior to termination, Defendant's failure to create a PIP for

15  Plaintiff before terminating her employment violated its own policies.  She also insists that

16  because her supervisors had consistently rated her performance as "satisfactory" or

17  "successful contribution"—as recently as the day before she was terminated—her firing

18  violated Defendant's procedures.  She relies also upon Leslie's emails, and in particular, her

19  recommendation that Defendant not complete Plaintiff's formal evaluation, as evidence that

20  Defendant, in its zeal to unlawfully terminate Plaintiff's employment, refused to follow

21  normal procedures and, in fact, "concealed" Plaintiff's satisfactory work performance.

22            The Court disagrees that the record supports a prima facie showing of national origin

23  discrimination.  First, a trier of fact could not find that Defendant was required to put

24  Plaintiff, a probationary employee, on a PIP before refusing to convert her to permanent

25  

26  [9] Plaintiff cites to Exhibit M as supporting her statement that "a non-Vietnamese Service
   Representative trainee was provided extra work assignments that directly related to work unit

27  goals." (Dkt. No. 42: 19:6-9.)  Exhibit M is a Certification of Recognition given to Lan Liu.
   (Dkt. No. 44-1, p. 96.)  Again, it is not a court's task "to scour the record in search of a

28  genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

United States District Court
Northern District of California

status.  Leslie also testified that "[w]e did not put FCIP employees on performance assistance plans because FCIP is a two-year program.  There is no need to put them on the plan because it's a two-year program."  (Dkt. No. 48, Ex. AA, 71:7-10.)   Thus, assuming there was a policy of generally following the cba for FCIP employees, there is no evidence in the record from which a reasonable trier of fact could find that Defendant's policies precluded Defendant from deciding not to convert a FCIP employee to permanent status without first placing the employee on a PIP.  There is no evidence that any FCIP employee had ever been placed on a PIP.

Second, Plaintiff's evidence does support an inference that Leslie believed that Plaintiff's low work unit productivity did not justify her termination.  That several employees, including Jones and Leslie, believed Plaintiff should have been permitted to convert to permanent employment, however, does not support an inference that Ricks' decision to the contrary was based on Plaintiff's national origin in light of the undisputed evidence that her productivity was 50% of her fellow FCIP co-workers.  Leslie apparently believed the termination of Plaintiff's employment was unwarranted because although she had documented low productivity, "she was not on notice that failure to improve her productivity could result in the loss of her job." (Dkt. No. 45, Ex. T, p. 32.)  Leslie may have been right.  Ricks' decision may have been wrong, unfair, and not in Defendant's best interest, but this is a lawsuit for national origin discrimination, not for breach of a cba or for lack of good cause to terminate.  This evidence simply does not support an inference that Ricks' decision was based on Plaintiff's national origin.

Third, Plaintiff's insistence that Defendant sought to hide evidence of Plaintiff's satisfactory job performance by placing the documents in an unmarked file is unpersuasive.  Leslie advised Hicks to place the productivity data in an unmarked (non-employee specific) file because they "cannot put something in one person's 7(B) [personnel] file that has information about another person on it." (Dkt. No. 48, Ex. AA, 165:15-19.)  Thus, the document comparing Plaintiff's work unit productivity with that of the other FCIP employees

United States District Court
Northern District of California

1  was not placed in Plaintiff's file *in accordance with* SSA policy which prohibits placing

2  documents referencing one employee in the personnel file of another.

3  　　　Ricks, the new District Manager, decided to terminate Plaintiff's employment based

4  solely on her work unit productivity.  Perhaps foolishly, he ignored the positive factors that

5  would have supported a different decision.  Accordingly, when it came time to process the

6  paperwork for her termination, Leslie told him not to input the positive performance

7  evaluation into the system because it would have been inconsistent with her termination to do

8  so.[10]  Again, while the evidence supports an inference that Plaintiff's firing was wrong-

9  headed, it does not support an inference that it was based on her national origin.  There is

10  simply nothing in the record that ties Ricks' decision to Plaintiff's national origin.

11  　　　Plaintiff's reliance on *Kolstad v. American Dental Association*, 108 F.3d 1431 (D.C.

12  Cir. 1997), *vacated and modified on other grounds*, 139 F.3d 958 (D.C. Cir. 1998), *vacated*

13  *and modified on punitive damages*, 119 S.Ct. 2118 (1999), is unavailing.  There the plaintiff

14  satisfied her prima facie burden by showing that she had applied for a promotion and the

15  promotion was given instead to a male.  *Id.* at 1436.  The court held that the plaintiff had met

16  her burden of showing that the defendant's proffered explanation for its decision—that the

17  plaintiff was not as qualified as the male—was a pretext because of evidence that the

18  defendant had pre-selected the male and never considered the plaintiff's qualifications. *Id.*

19  Here, in contrast, Plaintiff has not attempted to meet her prima facie burden by showing that

20  she was replaced by a non-Vietnamese employee.  And there is certainly no evidence of the

21  "pre-selection" of any other employee.  *Kolstad* is simply inapplicable.

22  　　　　　c)　　　**Defendant's Explanation for Plaintiff's Termination**

23  　　　Plaintiff also contends that national origin discrimination can be inferred here based on

24  Defendant's shifting and contradictory explanations for Plaintiff's termination.  *See Payne v.*

25  *Norwest Corp.*, 113 F.3d 1079, 1080 (9th Cir. 1997) (holding that the shifting explanation

26  _____

27  [10] Further, Leslie testified that under the Agency's performance appraisal system an employee
could be given an unsuccessful rating only if on a formal improvement plan and as discussed

28  above they did not place FCIP employees on performance improvement plans.  (*Compare*
Dkt. No. 48, Ex. AA at 42:1-45:13 *with* Ex. AA at 71:7-10.)

creates a material issue of fact because a "rational trier of fact could find that the[] varying reasons show that the stated reason was pretextual").

First, Plaintiff appears to repeat her argument that it was unfair to terminate her because of lower work unit productivity given that she was the only employee providing Vietnamese translation services and given that other permanent employees had lower work unit productivity.  The Court previously addressed these arguments.  *See supra* at pp. 13-15.  Again, that Ricks may have been wrong in concluding that Plaintiff's work unit productivity justified her termination does not support an inference of national origin discrimination.

Second, Plaintiff argues that there were multiple versions of her termination letter which suggests that there were shifting and contradictory explanations for her termination.  Plaintiff relies on the deposition testimony of Enrique Ortega, the Operations Supervisor, stating that there were multiple drafts of her termination letter and that the reasons changed throughout the drafts.  Plaintiff also cites to Exhibit W which includes several emails between Ortega and Yehuda Ben Israel, another supervisor, one attaching what appears to be the final version of Ortega's memorandum to Ricks recommending Plaintiff's termination based on failure to meet productivity goals, and another attaching what appears to be a prior draft.  While the second attachment includes multiple explanations for Plaintiff's termination, one of the explanations is her low work unit productivity compared to the other two FCIP employees, (Dkt. No. 45, Ex. W, pp. 42-43), the same reason given in the final memorandum regarding Plaintiff's termination (*id*. at p. 40) and given to Leslie (Dkt. No. 48, Ex. AA, pp. 34-35).  Thus, while the reasons for the termination of Plaintiff's employment may have been refined in the various drafts, her low productivity compared to the two other interns was consistently one of the reasons proffered for her termination.  This evidence does not represent "fundamentally different justifications for an employer's action [which] would give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason." *Washington v. Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1993).

19

1    Third, Plaintiff contends that "[t]he evidence offered at summary judgment in

2    declaration by Ms. Jones and Mr. Ricks differs substantively from the testimony that was

3    offered at deposition, when the testimony was perhaps less rehearsed." (Dkt. No. 42, 25:6-9.)

4    However, Plaintiff includes *no* record citations in support of this statement. Elsewhere in her

5    opposition, Plaintiff argues the Ricks showed a "lack of candor" testifying that he could not

6    recall specific details regarding conversations leading up to Plaintiff's termination or whether

7    he took into account Jones' evaluation of Plaintiff's job performance. In particular, Plaintiff

8    points to a series of questions where counsel asked him whether he considered Jones'

9    performance evaluation when making his decision and he testified that he could not recall.

10   Notably, counsel either did not ask him what he did consider in making the decision or did

11   not include those excerpts of his deposition testimony. Rick's testimony that he could not

12   recall if he considered all the positive things about Plaintiff in deciding whether to keep her is

13   not inconsistent with his declaration statements that he decided not to keep her because of low

14   productivity. (Dkt. No. 37; Nos. 49 & 50, Ex. BB; No. 51, Ex. GG at pp. 11-13). Again, it

15   suggests that he made a bad decision, but not one premised on a discriminatory intent.

16                    **d)    Omissions to the EEO Investigator**

17   Lastly, Plaintiff contends that discriminatory intent may be inferred from Defendant's

18   concealment of Plaintiff's positive performance reviews from the EEO investigator. This

19   unsupported argument is belied by Christina Jones' declaration to the EEO investigator in

20   which she indicates that Plaintiff had completed her work at a satisfactory level over the past

21   two years. Jones further states that she recommended that Plaintiff be promoted because she

22   felt Plaintiff could perform at the next GS level, but that management had made a contrary

23   decision. (Dkt. No. 51, Ex. FF, ¶¶ 7-8.) Thus, a reasonable trier of fact could not find that

24   Defendant hid details of Plaintiff's positive performance from the EEO investigator.

25   Accordingly, the Court concludes that Plaintiff has not made a prima facie showing of

26   employment discrimination based on her national origin because she neither demonstrated a

27   trier of fact could find that she was treated less favorably than similarly situated employees

28   nor that there is an issue of material fact as to whether other circumstances surrounding her

termination, considered in their totality, give rise to an inference of national origin discrimination.

### B.   Legitimate Reason for Termination

Even if Plaintiff had established a prima facie case of discrimination—which she has not—Defendant has articulated a legitimate, non-discriminatory reason for its actions.  *See Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123–24 (9th Cir. 2000) (once a prima facie case has been shown, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action."). Here, Ricks contends that he decided not to convert Plaintiff to a permanent employee because of her low work unit productivity compared to the two other FCIP interns.  As discussed above, it is undisputed that Plaintiff had significantly lower work units than the other FCIP interns throughout her tenure.  While both Defendant's reliance on work units and allocation of work units may have been unfair, a trier of fact could not find that they were improperly discriminatory.  *See Lawler v. Montblanc*, No. 10-01131, 2011 WL 1466129, at *7 (N.D. Cal. Apr.15, 2011) (finding that the stated reason need not have been "wise or correct," but merely lawful and nondiscriminatory) (internal citation and quotation removed). Accordingly, Defendant has met its burden of establishing that Plaintiff was terminated for a legitimate nondiscriminatory reason.

### C.   Pretext

If, as here, an employer meets its burden of articulating a legitimate, non-discriminatory reason for its decision, then the plaintiff must identify evidence that raises a triable issue of material fact as to whether the defendant's proffered reason is a mere pretext for unlawful discrimination.  *Hawn v. Exec. Jet Mgmt., Inc*., 615 F.3d 1151, 1155 (9th Cir. 2010).  A plaintiff may meet this burden by producing either direct evidence of discriminatory motive, which need not be substantial, or circumstantial evidence that is "specific and substantial" evidence of pretext.  *Godwin v. Hunt Wesson, Inc*., 150 F.3d 1217, 1221-22 (9th Cir. 1998); *see also Cole v. Permanente Medical Group, Inc.*, 2013 WL 1662857 *4 (N.D. Cal. April 17, 2013) (noting that *Godwin* is still good law in the Ninth

Circuit).  A plaintiff's subjective belief that his termination was unnecessary or unwarranted is not sufficient to create a genuine issue of material fact.  *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006).  In addition, "[a] plaintiff cannot defeat summary judgment simply by making out a prima facie case." *Lindahl v. Air France*, 930 F.2d 1434, 1437 (9th Cir. 1991).

As discussed above, the evidence here does not create a disputed issue as to whether Defendant's proffered reason for terminating Plaintiff at the end of her FCIP appointment was discriminatory.  The Court's decision does not turn on whether Plaintiff's evidence of pretext is "specific and substantial;" rather, there is an absence of any evidence that national origin discrimination was the true cause of Defendant's decision to fire Plaintiff.  Yes, there is a dispute as to whether Plaintiff's undisputed low work unit productivity compared to the other two interns was a good reason not to make her a permanent employee.  But the evidence simply does not support an inference that Plaintiff's national origin was the reason for the decision.

## CONCLUSION

If this were a lawsuit about whether there was good cause for the termination of Plaintiff's employment summary judgment would have to be denied.  But it is not; instead, Plaintiff contends she was fired because of her national origin.  Because the record does not support an inference that her national origin was a motivating factor in the termination of her employment, Defendant's Motion for Summary Judgment is GRANTED.  Judgment will be entered in favor of Defendant and against Plaintiff.

This Order disposes of Docket No. 35.


**IT IS SO ORDERED.**

Dated: April 22, 2013

JACQUELINE SCOTT CORLEY
UNITED STATES MAGISTRATE JUDGE